SHIVERS, Judge,
dissenting.
I respectfully dissent.
On September 4, 1984, appellee, Michael Jowers, intentionally shot and killed Michael Bessent in the home Bessent had shared with his wife and children during his marriage to Deborah Bessent. Bessent left surviving him three minor children, ages 5, 3, and 1, as well as his parents. Appellant, Mary Bessent Cote,[1] as the personal representative of the estate of the deceased, Michael Bessent, appeals final judgment, after jury verdict, in favor of Michael Jowers. The oldest child, Brittany Bessent, is the daughter of the decedent and Mary Bessent Cote. The other surviving children are the result of a marriage between the decedent and Deborah Bessent Jowers, who is now married to Michael Jowers.
The estate, by Mrs. Cote, seeks damages against Michael Jowers for the wrongful death of Michael Bessent. The estate contends that the defendant Michael Jowers either carelessly and negligently, or willfully, intentionally, and maliciously fired a gun at Michael Bessent, proximately causing his death. Jowers admits he intentionally shot Bessent, but he alleged below the following defenses: (1) self-defense; (2) trespass by Bessent; (3) violation of a restrictive court order prohibiting Bessent from coming on the premises after consuming alcohol; (4) lack of any justiciable issue of law or fact; (5) assumption of the risk; and (6) privilege to use deadly force. At issue is whether the trial court erred in its instructions to the jury and whether the verdict was contrary to the manifest weight of the evidence.
During Michael and Deborah Bessent’s marriage, they and their two small children and Christopher Crews, Mrs. Bessent’s child by a prior marriage, resided at 936 Player Road in Jacksonville. Mr. Bessent was a lineman who climbed telephone poles and installed lines for cable television. After their divorce, Deborah and the children continued to live on Player Road.
Through Michael Bessent, Deborah Bes-sent had met Michael Jowers, a 24-year-old Marine sergeant stationed at the Naval Air Station in Jacksonville. Jowers’ duties as a Marine Sergeant included attending monthly drill and predrill meetings. When Jowers killed Bessent, Jowers was living with Deborah Bessent in the house on Player Road. Jowers was also paying rent on a separate apartment which, according to his testimony, he had to maintain until his lease had expired.
There was evidence that a strained relationship had developed between Bessent and Jowers. The apparent reason for this strain was that after Deborah Bessent divorced her husband and began to cohabit with Jowers, she nevertheless continued something of a relationship with Bessent. Bessent’s visits to 936 Player Road after the divorce were fairly regular. Mrs. Deborah Bessent testified:
Question: Now, on how many occasions prior to this would Mr. Bessent come to visit you or come to the house and see you or whatever or talk to you or how would that occur? How often would that occur?
Answer: Approximately every other weekend and then sometimes he’d just pop over without — without me knowing.
Question: Did he have a key to the house?
Answer: No, sir.
Question: Did you ever refuse him entry into the house when he would come?
Answer: No, sir.
Jowers testified:
Question: And you had been living there on Player Road at the House?
Answer: That’s right.
Question: Was there any suggestion, Mr. Jowers, that Michael Bessent had been seeing or living with Debbie while you were away?
Answer: Yes, sir.
Question: And where did you get the information from?
*342 Answer: Debbie told me.
Question: And had that created any animosity between you and Debbie?
Answer: Yes, sir.
Question: Tell me what took place in that regard.
Answer: When I got back — I had been back two or three days, and one evening Debbie told me, said, “Baby, I got something I’ve got to tell you.”
So we went back in the bedroom. The kids were asleep. And she said, “While you were gone,” she said, “Mike came over one night,” said that he had tried to get her to go to bed with him, which he had done before on numerous occasions.
And she said he was saying, “You remember how good it used to be between us.”
She said, “Yes, but it’s over between us.”
He says, “Just give it one more chance.”
And she told me she saw this as a chance to prove to him once and for all that she didn’t want him. And she went to bed with him.
And he had said to her, he said, “If you can make love to me and tell me that you don’t love me, I'll leave you alone.”
He told her that, is what she told me. I believed her with all my heart.
She said, “All right.” And she did it. And she looked at him and said, “I don’t love you no more. I love him.”
And he left very upset.
Question: And this apparently occurred during the time you were gone?
Answer: That’s right.
Question: Well, did that create an additional anger in your [sic] against Bes-sent?
Answer: No, sir. I was mad at Debbie, because I’m a firm believer that a man can’t go to bed with a woman unless she wants him to, see; unless she lets it happen, whether she wants to or not, unless she lets it happen. I was mad at her.
Question: Was that subject brought up to Bessent or to you the night of the shooting?
Answer: No, sir.
According to Jowers’ deposition testimony, on September 4, 1984, Jowers returned to 936 Player Road at approximately 8:00 p.m. from a meeting at the Naval Air Station and noticed Michael Bessent standing on the front porch. Jowers went into the house through the back door and asked Deborah what Bessent was doing at the house. Sheryl Young, a friend of Deborah’s who was visiting the home at the time, informed Jowers that Bessent “just came over here causing trouble. He has been drinking, cussing at Debbie, aggravating her.” Jowers announced that he was going to have a talk with Bessent, and went out the front door to where Bessent was standing beside his motorcycle in the front yard.
Jowers said he told Bessent that Bessent should not be visiting the children except on weekends when a visitation had been set up in advance, and that he was not supposed to visit when he had been drinking. According to Jowers, Bessent had obviously been drinking. The conversation lasted a minute or two, at which point Jowers said Bessent stepped up to Jowers and pushed him in the chest with both hands. Jowers then hit Bessent, and the two men scuffled on the ground until Jowers pinned Bessent and ended the fight. Jowers agreed to let Bessent up if he would calm down and leave the premises. Bessent agreed to leave but, upon rising, kicked at Jowers. Jowers ran into the house, closed the door, and instructed Deborah to call the police. Sheryl Young had already done so and had them on the line, she and Debbie having witnessed the scuffle from a bedroom window.
Bessent was still outside the house, but was beating on the front door and yelling. Jowers went into his bedroom, grabbed a loaded pistol from his dresser drawer, returned to the wooden front door of the house (which had been closed since Jowers reentered the house) and opened it slightly. He again told Bessent to leave, warned him that he had called the police, and showed him the gun. Bessent then slammed into *343 the door, forcing it to open further, and entered the house. Jowers testified that Bessent then approached him, causing him to back up across the living room. While approaching Jowers, Bessent said, “What are you going to do with that, big boy? Come on, come on.” Jowers again told Bessent to leave. Bessent continued to approach, and Jowers continued to back up until he was into the kitchen area. Jowers then told Bessent not to come any closer or he would shoot him. At that point, Bes-sent (who was unarmed) “came at” him, and Jowers shot Bessent in the chest, killing him. Jowers picked up the telephone and informed the police, who were still on the line, that he had shot Bessent. The police arrived immediately thereafter.
The depositions of Sheryl Young and Deborah Bessent were read into the record at trial. The testimony of both women was fairly similar to Jowers’ version of the facts. In addition, both testified that Bes-sent had been using foul language and harrassing Deborah prior to Jowers’ arrival. Deborah testified that Bessent had been drinking, and that she had asked him to leave the house. Both Jowers and Deborah testified that Bessent had stated on other occasions he was going to kill Jowers or have someone kill him, apparently because he was jealous of the relationship between Deborah and Jowers. Jowers did not testify in person; he relied instead on those portions of his deposition which were read into the record by appellant’s attorney.
After the jury had retired to deliberate, it sent out the following question to the trial judge:
We would like to hear a clarification of the law regarding self-defense and the right of privilege.
Over appellant’s objection to rereading only that portion of the charge, the jury was brought in and the court reread Jowers’ requested jury instructions (numbers 4 and 5), which were the sole instructions given on self-defense and privilege:
THE COURT: You may be seated. Members of the jury, your question has been turned in to me and I believe it states: “We would like to hear a clarification of the law regarding self-defense and the right of privilege.” Is that the question to me?
A JUROR: Yes.
THE COURT: I am going to read to you the instructions and law regarding self-defense and also privilege.
A defense raised by Michael Jowers and is [sic] an issue in this case, is whether Michael Jowers acted in self-defense. It is a defense if the death of Michael Bessent resulted from the justifiable use of force likely to cause death or great bodily harm.
The use of force likely to cause death or great bodily harm is justifiable only if Michael Jowers reasonably believes [sic] that the force is necessary to prevent imminent death or great bodily harm to himself while resisting any attempt to commit burglary upon any dwelling occupied by him, or resisting any attempt to commit a burglary with intent to commit an assault in any dwelling house occupied by him.
A person is justified in using force likely to cause death or great bodily harm if he reasonably believes that such force is necessary to prevent the imminent commission of a burglary with intent to commit an assault against himself or another.
However, the use of force likely to cause death or great bodily harm is not justifiable if you find Michael Jowers initially provoked use of force against himself, unless: in good faith, Michael Jow-ers withdrew from physical contact with Michael Bessent and indicated clearly to Michael Bessent that he wanted to withdraw and stop the use of force likely to cause death or great bodily harm, but Michael Bessent continued or resumed the use of force.
In deciding whether Michael Jowers was justified in the use of force likely to cause death or great bodily harm, you must judge him by the circumstances by which he was surrounded at the time the force was used. The danger facing Michael Jowers need not have been actual; *344 however, to justify the use of force likely to cause death or great bodily harm, the appearance of danger must have been so real that a reasonably cautious and prudent person under the same circumstances would have believed that the danger could be avoided only through the use of that force. Based upon appearances, Michael Jowers must have actually believed that the danger was real.
If Michael Jowers was attacked in his home or on his premises, he had no duty to retreat and had the lawful right to stand his ground and meet force with force, even to the extent of using force likely to cause death or great bodily harm, if it was necessary to prevent commission of a forcible felony.
Another defense raised by Michael Jowers which is an issue for your determination is whether Michael Jowers was privileged to use deadly force against Michael Bessent.
The Florida Statute 782.02 states, the killing of a human being is justifiable homicide and lawful if necessarily done while resisting an attempt to murder or commit a felony upon the defendant, or to commit a felony in any dwelling house in which the defendant was at the time of the killing.
Those are your instructions on self-defense and privilege. You may—
A JUROR: Your Honor—
THE COURT: You can’t ask any questions. You can return to the jury room to deliberate. The only questions I can answer are those questions that the jury sends out to me in written form.
After retiring again, the jury asked a second question:
Is he within the law to kill in self-defense if he could have defended himself otherwise?
The trial judge then told the jury that since he had already read the self-defense and privilege instructions twice, there was no other appropriate comment he could make in response to the question. The jury returned a verdict in favor of Jowers. After final judgment, the court denied appellant’s motion for new trial.
Jowers’ intentional ending of a human life, through gunshot wounds fired at close range, warrants our close examination of the record. In this case there were six witnesses: Brian DeWitt Bessent, Brenda Holt, Mary Bessent Cote, Michael Jowers, Sheryl Young, and Deborah Bessent Jow-ers. Testimonies of Mr. Bessent, father of the decedent, Mrs. Cote, first wife of the decedent, and Brenda Holt, sister of the decedent, were all brief and not directly related to the killing. The testimonies of Michael Jowers, Mrs. Jowers, and Miss Young were by deposition. These key witnesses were not heard or observed by the jury or the trial judge.
In these circumstances, the presumption of correctness which ordinarily attaches to the trial court’s fact findings is slight because the jury and trial judge have not seen and heard the witnesses. As to these key witnesses, the appellate court has the same record before it as did the trial court and therefore has the same opportunity to weigh its evidentiary value. Hinkle v. Lindsey, 424 So.2d 983 (Fla. 5th DCA 1983). See also West Shore Restaurant Cory. v. Turk, 101 So.2d 123 (Fla.1958); Conklin v. Pruitt, 182 So.2d 644 (Fla. 1st DCA 1966).
These evidentiary sources, I think, clearly reveal certain salient facts about the events immediately preceding Michael Bes-sent’s death. First, at no time during his confrontation with Jowers, either in the yard, on the porch, or in the house, did Bessent display or threaten Jowers with a weapon of any sort. Bessent was at all times unarmed. Second, Bessent had left the house and, in all probability, would have departed on his motorcycle had not Jowers initiated the argument by going out into the front yard to accost Bessent. Third, the disparate physical abilities of Bessent and Jowers are evidenced by the fact that Jowers had no real trouble in besting Bessent and pinning him to the ground. Fourth, Jowers reentered the house, closed the door, and told Deborah Bessent to call the police. It was Jowers who reopened the door (thus making it possible for Bessent to force his way into *345 the house) and exhibited his gun to Bes-sent. Once he had again entered the house, Bessent used no force whatsoever on Jowers when Jowers shot him at close range with a .357 magnum. At best, Jow-ers may have feared another fistfight with a man who had been drinking and whom he had already easily brought under control. But there was nothing to cause Jowers to fear for his life, or for that matter, for the lives of Deborah Bessent and her children; nothing, in short, which would have justified the use of deadly force. Finally, although Jowers had given instructions to call the police, he shot to kill rather than cripple. In my view, these facts amply demonstrate that Jowers had no legal justification in killing Bessent and that, accordingly, the jury’s verdict was against the manifest weight of the evidence. On this basis alone, I would find that reversal and a new trial are warranted.
I also think that that part of the jury instruction which refers to section 782.02, Florida Statutes (1983)[2] severely misled the jury because it implies that once an intruder enters a home, the occupant can use deadly force to prevent any felony, and not merely those which are life-threatening. On this rationale, an armed homeowner, upon confronting an unarmed juvenile burglar in his home, may kill the juvenile with impunity, notwithstanding that the homeowner does not fear for his life and notwithstanding that a reasonable man similarly situated would not fear imminent death or serious bodily injury. See Note, Lovers and Other Strangers: Or When Is a Home a Castle?, 11 Fla.St.U.L.Rev. 465 (1983).
Clearly, this is not the law. Section 782.-11, Florida Statutes (1983), which states that “[wjhoever shall unnecessarily kill another, either while resisting an attempt by such other person to commit any felony, or to do any other unlawful act, or after such attempt shall have failed, shall be deemed guilty of manslaughter ...” limits the scope of section 782.02 by engrafting a standard of necessity on the justifiable use of deadly force. The Florida Supreme Court recognized this very principle in Popps v. State, 120 Fla. 387, 162 So. 701, 702 (1935), when it stated that “a plainly unnecessary killing, even defending oneself against an unlawful personal attack being made by the person slain, may be deemed manslaughter, where a plea of justifiable homicide under [section 782.02] is interposed as a justification, but such defense is not sufficiently supported to constitute an absolute bar to conviction.” Just this past year, the court stated:
A homeowner is not entitled to use deadly force to protect his person or dwelling in all instances. A homeowner may use deadly force to protect himself or his dwelling only if there exists a reasonable belief that such force is necessary.
Butler v. State, 493 So.2d 451, 453 (Fla. 1986); see also Falco v. State, 407 So.2d 203, 208 (Fla.1981).
The trial court should not give instructions to the jury which are confusing, contradictory, or misleading. Butler, 493 So. 2d at 452. It is manifest that the trial judge’s instructions suggesting that Jow-ers had a carte blanche right to kill Bessent once the latter entered the house confused the jury, for they requested not once, but twice, to be given a clarification on the justifiable use of deadly force. It bears repeating that the jury’s second request for clarification queried whether Jowers was within the law to kill Bessent in self-defense if he could have defended himself otherwise. To my mind, that the jury posed this question to the trial judge after he had completely reread them the instructions on self-defense and privilege illustrates not only that the instructions were confusing; it also points to the inescapable conclusion that the jurors simply could not believe that the law as to the justifiable use of deadly force in a dwelling house was as the trial judge explained it to them.
*346 I recognize that during the trial, appellant did not request instructions which would have taken into account the specific limitations on section 782.02 which I have discussed, and which Florida courts have acknowledged. I nevertheless would find that the trial court’s statement of the law of justifiable use of deadly force, as it appears in section 782.02, is so misleading as to have been fundamental error. If it “is fundamental that when the trial judge purports to give a charge on justifiable homicide, that every element of justifiable homicide ... should be given,” Bagley v. State, 119 So.2d 400, 403 (Fla. 1st DCA 1960), then it follows that the limitations on such a defense, as they appear in statutes and case law, are similarly fundamental.
Jowers’ killing of an intoxicated and unarmed man whom he had already outfought was a consequence he could have easily averted by simply remaining inside Deborah Bessent’s house until the police arrived. For the foregoing reasons, and because I believe that the majority’s opinion places this court’s imprimatur on a senseless and unlawful killing, I respectfully dissent.

. Mary Bessent Cote was married to Michael Bessent prior to his marriage to Deborah Bes-sent.

. The statute provides: "The use of deadly force is justifiable when a person is resisting any attempt to murder such person or to commit any felony upon him or in any dwelling house in which such person shall be.”